Good morning, Illinois Appellate Court. First District Court is now in session, Fourth Division. The Honorable Robert E. Gordon presiding. Case number 1-8-2-1-8-5. Oh, I'm sorry. Case number 1-9-0-7-8-4, Flynn v. Moshmire. Okay, with the lawyers who are going to argue the case, please introduce themselves to the court. Good afternoon, Your Honors. Alan Mandel on behalf of the appellants and cross appellees. Good afternoon, Justices. My name is Marty Schwartz and I represent the defendants' appellants, Mike Moshmire and Ann Moshmire. Okay, now as far as the appellant, are you going to reserve some time for rebuttal? Yes, I would like to reserve five minutes for rebuttal with respect to our appeal and also to deal with the cross appeal. I think I may misspoke. I represent the appellees, Mike Moshmire and Ann Moshmire, sorry. And I didn't have an opportunity to introduce myself. My name is Jeff Belzer. I represent Bank of America of North America. Okay, are you going to argue anything here? Yes. Okay. And all right, I think we'll give each side 15 minutes and the appellant gets five minutes for rebuttal. So he gets 10 minutes to argue and then five minutes for rebuttal. Okay, let's proceed. Very good. Thank you, Your Honor. I hope to take less than 10 minutes. There's a lot of briefing. There's a lot of words. There's a lot of numbers. I'd like to go over just a few. First number I'd like to go over is $651,104. That is the amount that the trial court awarded to the plaintiffs as punitive damages because Michael Moshmire had reached his fiduciary duties in such a deliberate and willful way that the trial court found the punitive damages were appropriate. Mr. Moshmire does not contest either the punitive damage punitive damages were appropriate or the amount of the punitive damages that were imposed upon him. Problem with that $651,104 is it's completely illusory. Notwithstanding public policy in Illinois to punish the wrongdoer, to deter the wrongdoer from doing wrong again, and to deter others who might read this opinion. Punitive damages award is feckless. It is void as against public policy because it doesn't do anything to punish. The next number I would like to deal with, of course, is the $768,000 that Mr. Moshmire concedes that he stole. And notwithstanding the fact that he concedes that he stole $1,768,000, he doesn't have to pay any of it back. He gets to keep it. That's not only inconsistent with an award of punitive damages. It's inconsistent with public policy that suggests that a wrongdoer gets to keep even a single penny of what he stole. So the next numbers that we have to focus on are 28 and 16. Because the trial court found that notwithstanding the standards in the LLC Act at the time, and notwithstanding the terms of operating agreement, he could award 28 times Mr. Moshmire's 2013 distributions as the fair value of his distributional interest upon dissolution. Or if you prefer the $177,000 which Mr. Moshmire averaged in distributions, he got 16 more years after he left the company and after he started a competing business. He got 16 years of future distributions as a reward for having stolen $1.768 million. And one of the most troubling aspects of what the trial court did, and frankly did because the trial court credited calculations which we've argued are not opinions and I think appropriately so. But what the expert said, what Ms. Hollis said was, well, the more he stole, the higher his valuation would be. That is, under any set of circumstances, insane. It is inconsistent with not only the operating agreement, but any case in which someone's interest in a business, be it the whole business or a fractional interest of the business, has ever been rewarded. It's a de novo standard to determine whether or not the trial court entered an order that was void as against public policy. The other de novo standard applies to the operating agreement. The operating agreement should be construed as a whole and no one argued below that that agreement was in any way ambiguous. Mr. Moshmire agreed to the same operating agreement in 2009 when he was a 50-50 member, as he did in 2013 when he reduced his interest to 42.5% for a nominal amount of loan forgiveness from Mr. Bereshevitz. If you construe the contract as a whole, it gives the chief operating manager discretion, broad discretion, to determine whether or not to distribute profits at all, and if he's going to distribute profits, in what amounts, in what non-allocate amounts, he is going to distribute them. He, in fact, did distribute on a non-allocate basis. Unwittingly, he over-distributed to the tortfeasor, to the fiduciary who was stealing. He under-distributed to the new member who got no distributions in 2014, or 2013 when he became a member, and 2014. And as a result, he made a capital call on a non-allocate basis on Mr. Moshmire to return 850,000 of the amounts stolen. The precise amount was not known at the time. Now, the only restrictions on Mr. Flynn, the chief operating manager's discretion, were number one, he could not make a capital call on anyone unless he had the agreement of 50% of the membership interest, which, of course, he had, and the duty of good faith and fair dealing, which is engrafted in the statute in the LLC Act with respect to the fiduciary duties owed by managers to other managers and to other members. What the trial court effectively said was, unless Mr. Flynn and Mr. Baryshevitz put in a million dollars, at the same time they asked Mr. Moshmire to put in 850,000, they could not make it, they had to continue to distribute to him as if he had not stolen. That is not a result that is suggested by the operating agreement, and not a result suggested by anything in Illinois law, and not really a result that's suggested by the one case that the trial court found in New York, in which the operating agreement that was being construed on an interlocutory basis in connection with the preliminary injunction, expressly required that all members make contributions in paired pursuit. This is not what that agreement says, and you can't logically construe it to say that, simply to reward a tortfeasor. So, then we get to the valuation, and it's kind of a mixed question of law, and effect of law, and discretion in terms of what the trial court could do. The statute told the trial court to, if it had the right, or if it had the authority to award a distributional interest, and why do I say if? Because the operating agreement says that if you don't meet a capital call, you're not entitled to future distributions. And we took the position with the trial court that Mr. Mashmire had stolen, had put the company in a capital deficit, and under no set of circumstances would be entitled, excuse me, to distributions until and unless he returned the money. And of course, he did not return the money. He confessed that he stole the money. He confessed that he had spent the money, and rather than doing anything to make amends, he opened up a competing business the next month and sued for dissolution, which of course failed, partially on the grounds that Mr. Flynn had not been nice to him because he hadn't paid him enough, ignoring for the fact that Mr. Mashmire had confessed to stealing $1,700,000. So if the statute were to apply, and the trial court was required under what was then section 3565, now repealed, to determine the fair value of Mr. Mashmire's interest, considering among other relevant factors the going concern value of the formula for determining value of distributional interest for any other purpose, and if appropriate, to specify installment terms, conditions of non-compete, and to subrogate the purchase to the rights of the company's other creditors. Now, clearly, the trial court did not make any reference to the statutory criteria that were in section 3565. There are a number of cases that construe the purchase of minority interests in corporations. There is no published opinion with respect to the WIGO factors as they may apply to section 3565, and in some regards, the court has been taken off the hook by the legislature because it has repealed section 3565, and future courts will not have to struggle with how to value a distributional interest in a limited liability company because what the legislature has done is to say, just treat the dissociated member as if he were a transferee, and whatever distributions the operating agreement provides for going forward, he will be entitled to. Now, of course, this operating agreement says Mr. Flynn has complete discretion, bounded only by the duty of good faith and fair dealing, to distribute, and clearly, if Mr. Mashmeyer is operating a competing business across the street, there's very little equity, very little basis for the chief operating manager to make distributions to his competitor. So what the trial court did was take alphabet, I'm sorry, mathematical soup, throw it up in the air, and come to a figure that provides Mr. Mashmeyer with somewhere between 16 and 28 years of future income, simply because he stole. That makes no sense under a mixed question of fact and law, because the trial court did not apply the law, or an exercise of discretion, because you can't tell that he exercised any discretion, or against the manifest weight of the evidence, because the only evidence that's before the court, was before the trial court, and is here, is the undisputed fact that the distributions were limited to $977,000 over the course of five and a half years before the fraud was detected. And that's only, and those distributions are decreasing over time, so that by the time Mr. Mashmeyer is excused, he's only getting $100,000 a year at the time the fraud is discovered. Well, you've used up your time, you need some time for rebuttal, you want to sum up a little bit? I only want to address very briefly our claim against the bank. Conversion under the statute provides that these were checks payable to Chicago Roofdeck, they were forged, improperly endorsed, and accepted by the bank, that is per se conversion. Thank you. And let me ask you a couple questions. The first question is, you know, your your last statement against the bank, I mean, wasn't that worked out by the judge, whatever damages that would have occurred, he dealt with, so that there are no damages really against the bank? I'm sorry, I have two answers to that question. The first is no, because the if you saw in my reply brief, if the bank was being, had pursued two employees who embezzled, and one of them had a valid employment discrimination case in an amount in excess of what they embezzled, that would not take the co-defendant off the hook. What you have here is a bank who has overlapping liability, different causation, bank certainly could have caught up. I'm not talking about causation, I'm talking about and the simple fact is, there's been no recovery, the plaintiffs have no money, they're supposed to pay Mr. Mashmeyer $200,000. We certainly hope ardently that you would reduce that so substantially that there'd be no question that the bank owes $500,000. But even if you, God forbid, you left that that judgment in place, the plaintiff still has the right to pursue Bank America for the $200,000 that it still has to pay Mr. Mashmeyer. All right, my next question to you is, would you agree that the public policy in Illinois, which is of course set by the Supreme Court, tells us that when someone breaches a fiduciary duty, it's with the willful, they get no money, but it's the court's discretion as to what they do. Once the court makes a finding that the breach was willful and deliberate, the discretion ends and the law requires the imposition of a complete forfeiture. So that the $651,000 figure that I started out with was a mistake, it should have been $977,000. Well, do you have a case that says it's a complete forfeiture? I believe that both Tully and Gitlitz address exactly that, come to the conclusion that there is no discretion when there is a willful breach. And I thought our briefs covered that. I suspect in my five minutes in return, I'll get you exactly the site. Okay, that's all the questions I have. Does anyone else have any questions? No. Justice Lampkin, do you have any questions? I said no, thanks. Okay, and Justice Burke, do you have any questions? No, thank you. Okay, let's hear from the FLE. Mr. Schwartz. Marty, you're muted. Okay. Good afternoon. My name is Marty Schwartz and I'm glad you advised me I was muted now, as opposed to the end of my presentation.  The standard of review is in this court and also in the trial court. So to be clear, on the issue of the valuation of Mike Mashmire's membership interest, that's reviewed based on a manifest weight of the evidence. And with respect to the plaintiff's claim against Mr. Mashmire for that it's the appropriate remedy is within the equitable discretion of the trial judge. There are some cases that the trial judge awarded complete forfeiture for. Even the cases that the plaintiff relies on, POLE and I believe it was ICI or ICL, they say it's equitable discretion. And of course, the Illinois Supreme Court, in re-merge of Pagano, specifically said that it's within the equitable discretion of the court to determine the appropriate remedy. Now, the plaintiff makes the argument that if a he's not entitled to recover for the value of his interest in the LLC. Well, that's a ridiculous argument. So for example, if I own, if I steal $10,000 in a multi-million dollar company, and my interest was worth a million dollars, I forfeited my interest. There's not a single case, not a single case that says if there's a breach of fiduciary duty, a shareholder or a member forfeits his ownership interest in the case. And in fact, the statute, section 3565, specifically says when a member's been disassociated, the court will determine the disassociated member. And that's exactly what the court did here. Now, I want to go through a little bit of the plaintiff's conduct in this case, because the court has equitable discretion on the remedy, and also had to determine the credibility of the parties when it was determining the manifest weight of the effort. And the trial court's finding show that the plaintiff fabricated evidence, fabricated these guarantee repayment agreements. He found that the defendant threaded evidence that would either support, I'm not the defendant, the plaintiff's shredded evidence that would either support or negate these guarantee repayment agreements. He found that the plaintiff, and that's Darren Flynn, committed perjury, submitted an affidavit stating that he's and then at trial, albeit reluctantly admitted he does have an accounts payable ledger, but he decided not to produce it because he said it was inaccurate. And that was one of the key issues. And in addition, the court found that Darren Flynn, the plaintiff, committed bank fraud on multiple occasions. Before the lawsuit and during the lawsuit, Mr. Flynn submitted tax returns and financial information to the banks, knowing that these weren't the real tax returns. So when the trial court was evaluating what was an equitable remedy and looking at the manifest weight of the evidence, it took into account these various factors. And you didn't hear the trial court in its opinion say one bad word about Mr. Mashmire's testimony, that he lied, that he did anything of the sort. Now, with respect to the amount awarded, the net amount awarded to Mr. Mashmire, the court said that the plaintiffs have already received, even after you net it out, a windfall. Because the amount that Mr. Mashmire has to pay back, these were what were called side jobs during the trial. And the court said that the plaintiffs knew about these side jobs. In fact, one of the plaintiffs, Tom Barshawitz, he was paid to perform some of these side jobs. The other subcontractors told Barshawitz that Mike Mashmire's paying them with personal checks. In addition, as the court found, Mike was not hiding any of these side jobs. His desk wasn't locked, the folders were on his desk. When checks would come in payable to him, he went across the street and put it in his own bank account. And Mr. Flynn knew this, he went across the street, asked the bank, Bank of America, I believe it was, does Chicago Roofdeck have an account here? And they said no. And Flynn just dropped the issue. So the court not only found specifically that the plaintiffs knew about these side jobs, but he also found that had Mike tendered these jobs to Chicago Roofdeck, Chicago Roofdeck would not have accepted them. That's because they weren't part of their business model. Chicago Roofdeck does roof decks. And these jobs were primarily small jobs, low profit landscaping jobs for Mike's friends. So the fact that it's not like Mr. Mashmire took money that Chicago Roofdeck generated from its business. This was additional jobs that Chicago Roofdeck never would have performed. Nonetheless, the court said he has to pay it back. But the court added an additional windfall in favor of the plaintiff, which was he made or his award was the gross amount that Mike Mashmire received on the side jobs. Even though the case law says it should be the net profit that Mr. Mashmire made and not the gross receipts. The court found that the evidence and therefore said, I'm just awarding the gross amount. Let me ask you this. Isn't it the public policy in Illinois based on our Supreme Court decisions that when somebody reaches their fiduciary duty willfully that the court has the total That's what the appellate court cases say. And that's what the Illinois Supreme Court case, the Illinois Supreme Court says, and the court exercise its discretion. And we're, we're not appealing from there. From that from the exercise that discretion. Okay. One other point I want to make on that, though, the amount that was forfeited was not compensation paid to Mike Mashmire. These were his profit distributions by virtue of being a shareholder or a member in an LLC forfeits its dividends or its or its share of the profits by breaching his fiduciary duty. The only thing that they would forfeit, and that's up to the discretion of the court, would be their, their compensation, salary, wages, bonus, none of that. But nonetheless, the trial judge said, well, I'm going to forfeit two thirds of the distributions. We're not appealing. Yeah, you're past your time. So, so kind of sum it up. The only other thing I'll say on the issue of valuation plaintiff's expert defendant followed the methodology of the plaintiff's expert and the plaintiff did not testify plaintiff's expert did not testify and did not prepare a rebuttal report to rebut the defendant's position on valuation. Thank you very much. Okay. All right. Mr. Belser. Thank you, your honors. I want to begin by acknowledging the obvious, which is that Bank of America is ultimately a bit player in this litigation. The trial court issued a 27 page opinion after the completion of trial, after post trial briefing, after oral arguments, and only gets to the claims against Bank of America on page 26 of those 27 pages, and then fully resolves the claims against Bank of America into paragraphs. By my calculation, that's about 4% of the ruling. And that seems about right, given what the trial looked like. Having sat there, I would say that 96% of the trial involved Flynn versus Mashmire and Mashmire versus Flynn. I would like to tell you, I'm going to keep my comments to 4% of the allocated time. Accordingly, I don't think I can do that because I'd have to stop like right now. But I'd like to briefly talk about what the trial court did in regards to the claims against Bank of America. Because I think that the way that the court proceeded is, arise from basic, fundamental, well established law. And it's difficult to understand how it can even be questioned. The reality of the case here is that under Illinois law, and really under the law throughout the country, a plaintiff is entitled to state as many claims as they want against as many defendants as they want, but they can only have one recovery for one loss. And what happened here is plaintiff stated five claims, four against Mashmire and one against Bank of America. The court resolved those claims in the order that they were pled in terms of counts one, two, three, and four against Mashmire. By the time they got to Bank of America on count five, the court determined that there was nothing left to decide, that plaintiff had made a recovery. And briefly, if you look at the facts that got to that result, it's pretty clear that the court was correct in doing so. The underlying facts are that Mashmire went out and performed jobs for third parties. Third parties provided checks to Mashmire. Mashmire brought those checks to Bank of America. And Bank of America, there were 117 checks in total. Bank of America cashed those $500,000. Ultimately, the claims of Flynn versus Mashmire are that Mashmire had no right to keep that $500,000, that that $500,000 should be dispossessed from him and provided to Flynn. And ultimately, that's what the court did. Not only did Flynn get a judgment regarding that pile of money, that $500,000, despite what plaintiff has told you, plaintiff has actually collected, according to the court's order, on that on those funds. Plaintiff said plaintiffs don't have a recovery. That ignores the math here. The reality is that the court awarded Mashmire $2.8 million, and they awarded plaintiff about $210,995 less, which includes that pile of money, which includes that $500,000. For plaintiff to say that he doesn't have a recovery just ignores that. Otherwise, he would have to write a check to Mashmire when all is said and done for about $500,000 more than that. So in terms of what the court did, it put everybody back to their position. The court determined that Mashmire could not hold those funds. They dispossessed Mashmire of those funds. The court, Flynn indicated that he was entitled to those funds. The court awarded those funds to Flynn. In terms of Bank of America and the third parties, Bank of America paid out $500,000. Bank of America had $500,000 in checks. Bank of America collected that from the third parties. The third parties received the work that was performed for them and paid value for that. Everything was zeroed out. The fact of the matter is that the trial court proceeded absolutely 100% in accordance with stated law and, as I said, with fundamental basics of law. They applied principle of set-off. Principle of set-off basically says that it's ludicrous for A to pay B and to require B to pay A when there's claims that are overlapping and we can just do the math and figure out what the net is. It would be even more ludicrous in this matter to not apply set-off where not only is there A paying B, A Flynn paying B Mashmire, B Mashmire paying Flynn, but also there would be C Bank of America paying A Flynn and then B Mashmire paying C Bank of America based upon Bank of America's cross claims for breach of warranty in regards to the presentment of the checks. We believe that the court should absolutely affirm the court's ruling in regards to the claims against Bank of America. I just wanted to address one other thing. You asked plaintiffs if their position was that they should have more than one recovery and plaintiff argued here exactly in contradiction to what they argued at the trial level. If you go back in the record and it's referred in the order, the plaintiff in their post-trial reply brief stated plaintiffs agree they are entitled to only recovery and that the funds collected from after the judgment from Bank of America will be credited to Mashmire. So, while it didn't work out exactly that way, the same principle applies. Plaintiff has one recovery. The amounts collected by my plaintiff from Mashmire must be offset in regards to Bank of America. In regards to the substance of plaintiff's claims against Bank of America, the court declined to go into those and to fully address Bank of America's defenses. I had actually prepared a discussion of how plaintiff didn't meet his burden in that regard. I'm more than glad to provide it to the court, but I want to be brief. So, I'm going to just, if the court wants me to get into that, I'm more than glad to do so. But I think the record's very important. Thank you. Thank you. Rebuttal, Mr. Mandel. Yes. I have three points I'd like to get through. I think I can get through them in five minutes or less. Oh wait, let me stop for a moment. Does any members of the panel have any questions from the last person? I do not. Pardon? No. Justice Burke, do you have any questions? No, I don't. Thank you. Okay. Okay. Thank you. With respect to the question of complete forfeiture, this court in 19, I'm sorry, in 2014 in ICD Publications v. Gitlitz at paragraph 58, cited the Tully and LID v. Dolan decisions and said, and I quote it, paragraph 58, a willful and deliberate breach of a fiduciary duty requires complete forfeiture of all compensation during the periods of breach. The Pagano case can't be found to be a holding suggesting to the contrary, because of course, there was no breach of fiduciary duty in Pagano and whatever the Supreme Court was speculating on has no application here where there is clearly a willful and deliberate breach. The second, and your honor, I asked your coordinator yesterday if we'd be able to and the issues that I take with what I believe are misrepresentations of the record. But so if I would be permitted to share a couple of pieces of the record with the court, I think we can put the whole side job question aside. May I? Sure. Why not? Very good. So what we have on, I have to hit the share screen. And there we are. What the court now has on its screen. We don't have anything on our screen. It now says the host has disabled that. Yeah, I don't think we have the facility for that. All right. We do have it, but I don't know if Darren is there. I believe Mr. Schaefer has it. I'm here. What do you need me to do? I need you to allow the host to share the screen. Okay, well, Darren, are you there? I'm listening. Yeah, I'm trying to do it now. Hold on, please. Are you able to do it now, Mr. Mendo? I will try again. And that should be share. All right. What the court has in front of it is the first page of Mr. Mashmeyer's Exhibit 54, found at the supplemental record 785. This is the general ledger for 2011, which has every check and every deposit of the company for the year. Now, if we go down to which includes deposits by customers. And if we go down to, for instance, page 5, we'll see I have highlighted customers Vland for two checks that were deposited into Chicago Roof Deck and customer Benson. Now, we look at the checks that Mr. Mashmeyer deposited that he claims are side jobs. And here's the check applicable to Mr. Benson. He's not a side job. He's not somebody who's not a customer of Chicago Roof Deck. The check was written to Roof Deck and Mashmeyer altered it. And with respect to Vland, it's not a side job. It's a job payable to Chicago Roof Deck and Garden and Mr. Mashmeyer altered it. Mr. Mashmeyer had absolutely no contracts for any side job whatsoever. This is all work for Chicago Roof Deck customers that Mr. Mashmeyer went to the customer, took the check and then deposited it. And it is against the manifest weight of the evidence for the trial court to have overlooked the general ledger, which shows who the customers are. And we also admit, I'm sorry, we, Mr. Schwartz also introduced all the customer contracts and ignore what's clear from the general ledger and from the checks. Same people, not different people. And the trial court suggestion, and by the way, he only suggested it in some kind of mitigation and justification for a partial instead of a complete forfeiture. And of course, once he found it was a willful and deliberate act, which plainly it was, he was wasting his time in trying to draw a fine line distinctions between Mr. Mashmeyer's subjective intent and what the court plainly found was the law. With respect to experts, we were under no obligation to do anything except called to the trial court's attention how insane Mr. Mashmeyer's expert was. She conceded that she didn't have opinions. There were only calculations. She conceded that the calculations were not consistent with recognized standards in her profession. She conceded that there was no sanity check applied to the hodgepodge of numbers that she threw in. And she conceded that she ignored the operating agreement and its limitation on distributional interests. So you see a lot of these valuation cases get reversed in the divorce cases. And we cited a number of divorce cases. And one of those cases relies in turn on a case called Bauer, which is from the 80s. I have the site here. I can hold it, I think. And that's a case where the husband hired an appraiser to say his business was worth $1,000. And the wife didn't call an expert. Maybe she couldn't afford it. Maybe it was a tactical decision. I don't know. But it's marriage of Bauer. It's found at 138 Ill App 3rd, 379. And what the trial court did is he found that notwithstanding the fact that there was an expert who came to an opinion of $1,000, the trial court thought he was wrong by a factor of 66,000. Because he found the husband's business to be worth 66,000. Mr. Schwartz in his trial brief cited the same cases that we did to the effect that the trial court is not bound by either of the appraisers. The trial court has to do an independent analysis. And I mean, Mr. Schwartz in his pre-trial brief, you can find it in the common law record at pages 112. I'm sorry, 1112 and 1113. He cites Weigel because for the proposition that the trial court was not limited to any single form of valuation. Stewart versus D.J. Stewart for the proposition that no single methodology of determining fair value should be operative. We were perfectly within appropriate trial presentation to call out the fact that the hodgepodge of numbers included 852,000 of the money that Mr. Mashmeyer admittedly stole, 42.5% of the 1.7 million. And that the rest of the numbers were nonsense. Well, let me ask you this question. Do you think that we have the right and the power to overwrite a trial judge who accepts one expert over another? Yes. On many occasions, first of all, the expert has to have an opinion, okay? That opinion has to have a proper foundation. If it's not an opinion and there's not a proper foundation, and it is by her very own testimony, not checked by anything relating to what her professional standards call a sanity check, it's not- Did you object to the basis of this opinion? Did I object to the basis of this opinion? I object to the basis of this opinion vigorously, which according to one of the cases that I cited, was a perfectly appropriate way to contest an expert's opinion. And throughout our post-trial briefs, we told the trial court that nothing in her calculations had any connection- Yeah, but my question you didn't answer. At the time the report was entered into evidence, did you object to it at that time? I stipulated, notwithstanding the fact that I objected to its relevance, I stipulated that they could use it. But then I objected it to cross-examination. And then- What type of objection was that? What type of objection? Well, for instance, I did specifically object to this calculation that's not in the report. Well, what happens if there's no third-party debt? I object- Well, but my question was when it was offered into evidence, did you object to it being- I thought you stipulated- I contested its relevance. Okay, just its relevance. Correct. And then I completely undercut all of its purported basis. First thing she said on cross-examination is, no, this is not an opinion of value. Okay. That is a term of art. She said, no, it's not an opinion of value. It's only an estimation of value. And then it went downhill from there. You have every right under the cases that we've cited to find this testimony to be anything but an opinion, let alone a credible opinion. And yes, under the Bauer case and a number of other cases that we've cited too, you have the authority as an appellate court to find that what the trial court did with respect to opinion testimony lacked foundation and was not appropriate. Yeah, but that's on foundational grounds. That's not substituting our judgment for theirs. So what judgment did the trial court exercise? He basically ignored all of the law and said, it's a battle of experts and I can only pick from one or the other, Mr. Schwartz. And I agree, that's not the law. The trial court, particularly in a case of the valuation of a fractional interest of a business is required by law, Weigel and other cases to perform an independent analysis and is not bound by either party's expert. Particularly in a case like this where Ms. Hollis- And you're saying there was no independent analysis? Not by the trial court, none whatsoever. In fact, his award exceeds Ms. Hollis' opinion by a full million dollars. There's a number of cases that say when the trial court goes off the reservation and does not stay within the bounds of the two experts, that it's subject to particular scrutiny. Okay, so you're saying that he took some of the things into consideration and not all of the things. He took none of the facts and circumstances necessary to do a proper determination of the fair value of a distributional interest. First of all, he ignored the operating for all purposes, including what the expectations might be for Mr. Meshmeyer in the future for any distributional interest. Second, he ignored all of the factors that are cited in the Weigel case and in the other cases in which closely held businesses are being valued for one purpose or another. He gave you absolutely no analysis other than to say, Hollis says this, she calculated this, she extrapolated that and she's credible because we didn't call it a rebuttal witness. Well, she's got to be credible on her own and she's not, and she admitted she's not. She admitted she produced no, she performed no sanity check on these numbers. I could go into, I could share my screen with respect to the experts. No, I think, you know, I think you made clear what your points are together with the brief and what you've said. Okay. Well, thank you very much. Okay. Well, I want to thank all the lawyers for their presentation and their briefs. It's a very interesting case and you'll have an opinion or an order very shortly. The court is adjourned. Thank you. Thank you very much.